**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Carl Clayton CHENAUR,**
**Defendant-Appellant.**

No. 76–2236.

United States Court of Appeals, Ninth Circuit.

April 18, 1977.

Hugh W. Stroh, argued, Bellevue, Wash., for defendant-appellant.

Jack Meyerson, Asst. U. S. Atty., argued, Seattle, Wash., for plaintiff-appellee.

Before KENNEDY and ANDERSON, Circuit Judges, and VAN PELT, District Judge.*

ROBERT VAN PELT, Senior District Judge.

Carl Clayton Chenaur appeals his conviction by a jury on all counts of a 22 count superseding indictment relating to (a) aiding and abetting officers of an institution having federally insured accounts who had intent to defraud their own institution, the United States, or the Federal Savings and Loan Insurance Corporation (21 counts based on 18 U.S.C. § 1006 and 18 U.S.C. § 2) and (b) making a false statement to a government agency (one count based on 18 U.S.C. § 1001).

The essential facts leading up to his indictment are as follows:

Chenaur was a mortgage banker and president of First Western Mortgage Company and Bonded Escrows, Inc. Both companies make mortgage loans to individual homeowners. In the interests of clarity, a brief explanation of terminology and practice in the mortgage loan industry is in order. Mortgage companies generally finance consumer loans by borrowing money from institutions such as banks or insurance companies. The mortgage company usually sells the mortgages as soon as they obtain them instead of holding them for an extended period and tying up their own capital. Sometimes a mortgage broker is used to find a buyer for the mortgages. Frequent mortgage buyers are savings and loan associations, mutual savings banks, life insurance companies, pension funds, or other long term investors.

During the period covered by the indictment, Chenaur (as principal of First Western) sold approximately $1,800,000 worth of FHA and VA mortgage loans to Greenwood Savings and Loan Association. Initially, Greenwood gave First Western a letter of commitment dated June 23, 1971 to purchase $700,000 worth of loans from First Western. This letter was signed by Biff Connelly, the vice president of Greenwood. In exchange for the commitment, and at approximately the same time, Chenaur paid Greenwood a 1% precommitment fee ($7,000), which was standard in the industry. Chenaur testified he later had a verbal commitment from Marvel Morgan, the president of Greenwood, that Greenwood would purchase additional loans from Chenaur, which they did. On both the original $700,000 loan package and the subsequent loans sold to Greenwood, Chenaur paid an additional 1% fee to entities entitled Territorial Investors and Morco Enterprises, Inc.[1] Biff Connelly and Marvel Morgan were the only persons in those companies.[2] Connelly and

---

* The Honorable Robert Van Pelt, Senior Judge, District of Nebraska, sitting by designation.

1. Chenaur admitted payments totalling $18,000 to Territorial and Morco but claimed that not all of these payments related to the FHA and VA loans in question, and that he didn't think he had paid a 1% brokerage fee on the initial $700,000 worth of loans. However, it is clear that 1% was the standard fee arrangement and that this was regularly remitted to Territorial and Morco. The only question before us on appeal with regard to these fees is whether they constitute legal brokerage fees.

2. Additionally, Tye Morgan, who is Marvel Morgan's son, was named as an incorporator of Morco Enterprises, Inc. but only one of the 21 checks was addressed directly to him. Chenaur testified before the grand jury that he gave Tye Morgan's check personally to Marvel Morgan and that he did not think Tye Morgan ever

Morgan, in addition to being vice president and president of Greenwood, were both members of the seven-man board of directors. This additional 1% fee provided the basis for the criminal charges against Chenaur. The government claimed that the fees to Territorial and Morco were kickback payments. Chenaur classified the payments as brokerage fees. At issue during the trial was whether Morgan and Connelly, as principals, had the requisite intent to defraud Greenwood and whether Chenaur knew of this intent and wilfully assisted them in the criminal venture.[3] The jury found the requisite intent and returned a guilty verdict against Chenaur.[4]

On appeal, Chenaur raises the following issues:

1) Whether any institution protected by 18 U.S.C. § 1006 was defrauded where Greenwood received the going rate in precommitment fees and the institution was not adversely affected financially;

2) Whether there was sufficient evidence that both defendant and the principals had the requisite intent to defraud;

3) Whether defendant could be convicted of aiding and abetting when neither principal was charged with a federal crime;

4) Whether the indictment sufficiently informed defendant of the charges;

5) Whether the trial court erred in denying defendant's motion for continuing discovery and a bill of particulars;

6) Whether the defendant was prejudiced by the filing of a superseding indictment; and

7) Whether the trial court erred in not asking proposed voir dire questions.

■ In considering these issues we must keep in mind that the evidence is to be viewed in a light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

## I. WHETHER THERE WAS SUFFICIENT EVIDENCE THAT GREENWOOD WAS DEFRAUDED

Defendant contends that Greenwood could not have been defrauded because they were not injured financially. It is his position that if anyone was defrauded it was the rest of the members of the board of directors who did not share in the brokerage fees which were legal. Chenaur contends that the board of directors is not a legally protected entity under 18 U.S.C. § 1006 and thus no basis exists for the criminal charges brought here.[5]

---

received it. Biff Connelly testified that the proceeds from the checks made out to Territorial Investors and Morco Enterprises, Inc. went to either Marvel Morgan or himself, so it is relatively clear Tye Morgan was never an active participant in Morco Enterprises, Inc.

3. Instruction No. 9 reads as follows:

In order to establish the offenses charged in Counts I (one) through XXI (Twenty-one) of the Indictment, the Government must prove each of the following elements beyond a reasonable doubt:

FIRST: That officers of Greenwood Savings and Loan Association received or shared in money or benefits of a transaction with Greenwood Savings and Loan;

SECOND: That the acts of the officers were done with intent to defraud Greenwood Savings and Loan;

THIRD: That CARL CLAYTON CHENAUR aided and abetted officers of Greenwood Savings and Loan (a) knowing of the Greenwood officers' intent to defraud and (b) intentionally associating himself

with their criminal venture, participating in it and trying to make it succeed; and

FOURTH: That Greenwood Savings and Loan Association was insured by the Federal Savings and Loan Insurance Corporation.

There can be little question that the monies Chenaur paid Territorial Investors and Morco Enterprises, Inc. were a direct result of Greenwood's purchase of mortgage loans from First Western and that Morgan and Connelly received such monies; likewise, there was little question Greenwood was federally insured. Therefore, the only real issue left for the jury was intent.

4. Neither Morgan nor Connelly were prosecuted in the federal courts for this offense.

5. Counsel for Chenaur also argued both at trial and in the brief for appellant at pages 23–25 that:

[T]here are 12 preapproved servicing activites [*sic*] a board of directors of a savings and loan institution can participate in without violating

The answer to these arguments lies in (1) whether the fees paid by Chenaur to Morco and Territorial were in fact legal brokerage fees and (2) the meaning of the term "defraud."

"transactions" with their institution. Particularly, the first activity which has been preapproved by the Federal Home Loan Bank Board is set out as follows:

> Substantially all of the activities performed directly or indirectly through one or more subsidiaries consist of one or more of the following; originating, purchasing, selling, servicing any of the following: (a) Loans and participations in loans on a prudent basis and secured by real estate including brokerage, warehousing of such real estate loans . .

C.F.R., vol. XII, § 545.91(a) [*sic*]

It was not until February 6, 1974 that the very first definitive statement as to whether or not personal dealings of the members of the board of directors of savings and loan associations are, in fact, prohibited by banking laws in and of themselves.

On February 6, 1974 the Federal Home Loan Bank Board adopted a policy called corporate opportunity in insured institutions.

> Directors and officers of an insured institution and other persons having the power to direct the management of the institution stand in a fiduciary relationship to the institution and the shareholders. Out of this relationship arises, amongst other things, the duty of protecting the interests of the institutions.
>
> It is a breach of this duty for such a person to take advantage of a business opportunity for his own or another person's personal profit or benefit when that opportunity is within the corporate powers or the institution or a service corporation of the institution, and when the opportunity is present for potential practical advantage to the institution. If that is present, then it is a breach of the fiduciary duty.

Comments, C.C.H., *Banks and Banking Institutions,* § 545.91. More importantly:

> No corporate opportunity for a federal association to enter into business shall deem to exist or to have existed, if the referral described in the paragraph in this section *took place before May 20, 1971, or a reasonable period of time thereafter not to exceed 18 months.*

(Emphasis added)

The period of time in which the alleged illegal acts were commenced is contained in the indictment and specifically falls within the time period that the Home Loan Bank Board decreed that there could not be a breach of corporate opportunity. (*See* superceding indictment.) Logically, the interaction of the Federal Home Loan Bank Board and 18 U.S.C. § 1006 leads to the conclusion that if the principals, Mr. Morgan and Mr. Connelly, did not breach a law during the period of the indictment, the district court lacked jurisdiction in which to try the case. Failure of the·two board members to turn over the monies to the remaining members may have perpetrated a fraud upon the *board* of *directors* BUT NOT ANY ENTITY protected under 18 U.S.C. § 1006.

We have quoted counsel's language verbatim to show that his argument is unclear and that his quotations and citations are incorrect. The reference to C.F.R. § 545.91(a) is presumably § 545.9–1(a)(4) although it is an inaccurate quotation of that section as it existed for any of the years 1972–76. After searching for the C.C.H. publication, Banks and Banking Institutions, the court called a representative of Commerce Clearing House and was informed that there is no C.C.H. publication called Banks and Banking Institutions. Similar, although not identical, quoted language appears in 12 C.F.R. § 555.17. The title of that section is "Insurance Agencies—Usurpation of Corporate Opportunity." The section relates to insurance agencies operated by a federal savings and loan association. There never was a claim in this case that Morgan and Connelly were providing insurance services to Chenaur in return for the 1% fee.

The section relating to corporate opportunity in insured institutions is 12 C.F.R. § 571.9. That section contains no grace period extending back to May 20, 1971. Such a grace period seems to be an integral part of counsel's argument. Counsel's attention is called to 12 C.F.R. § 545.6–10 (1976) which states:

> No director, officer, or employee of a Federal association . . . may receive from . . . any . . . source any fee or other compensation of any kind in connection with the procuring of any particular loan from or by such association. Borrowers may be required to pay the necessary initial charges in connection with the making of a loan, including the actual costs of title examination, appraisal, credit report, survey, drawing of papers, closing of the loan, and other necessary incidental services and costs in such reasonable amounts as may be fixed by the board of directors; . . . *Provided,* That no discount, rebate, or commission on any such charge may be received by any director, officer, or employee of a Federal association . . . .

Frankly, we fail to see what Federal Home Loan Bank Board policy has to do with a crime charged under 18 U.S.C. § 1006. Either a crime has been committed under § 1006 or it has not regardless of Federal Home Loan Bank Board policy. At any rate, it is clear for the reasons given in the text that the principals Morgan and Connelly were not actually providing bona fide services which would have qualified as a pre-approved activity for a service corporation in which a federal association owns stock.

There was ample evidence that none of the normal brokerage services were supplied by Morgan and Connelly. Connelly testified he would not characterize the fees he received as broker's fees. Both Connelly and Morgan stated they performed no services for the fees, and even Chenaur testified he did not think Morco or Territorial were providing any particular service, and that:

> [I]f I didn't write the checks to Territorial and Morco, they [Greenwood] wouldn't buy my loans.

T. II, p. 349, 1. 18–19.

■ Even if Greenwood suffered no economic loss through the dealings with Chenaur,[6] it does not mean there was no intent on the part of the principals to defraud the institution. The trial court correctly recognized this in its Instruction No. 11 to the jury.[7] As the Fifth Circuit has stated in *Beaudine v. United States*, 368 F.2d 417, 420 (5th Cir. 1966):

> The fraud commences with the deceit— ostensibly acting solely for the interest of the principal while all the while the faithless servant knows he, too, has a pecuniary interest which will or might subvert his undivided loyalty. When there is the purpose to deceive, it matters not whether the objective is to obtain an advantage or to cause the principal to suffer a loss. Either in effect completed the fraudulent purpose.

The evidence was uncontradicted that the board of directors (who can hardly be separated from the corporate identity of Greenwood) did not know of this 1% fee to Territorial Investors and Morco Enterprises, Inc. which Connelly and Morgan were receiving. Connelly testified that the fees they received were not disclosed to the board because the fees were contrary to state and federal regulations and they would have been fired. Morgan also testified the 1% fees were not disclosed to the board. Additionally, both Morgan and Connelly testified that Chenaur knew these 1% side payments had not been disclosed to the board. There was sufficient evidence for the jury to find Morgan and Connelly intentionally deceived Greenwood in order to further their own financial gain.

We find there was sufficient evidence to show an institution protected by 18 U.S.C. § 1006 was defrauded.

## II. CONVICTION FOR AIDING AND ABETTING

Chenaur's second and third issues deal with his conviction as an aider and abettor. He contends that where neither Morgan nor Connelly had the requisite intent to defraud he cannot be guilty as an aider and abettor. Additionally he contends that, where Morgan or Connelly were prosecuted only by state officials for state related offenses of falsifying corporate records and embezzlement, there was no showing of guilt on the § 1006 charge and the jury confused the state and federal charges.

■■ We have already found there was sufficient evidence of Morgan and Connelly's intent to defraud. There is no merit to the argument that a defendant cannot be

---

6. We express no opinion as to whether Greenwood suffered financial loss or not. However, we note that there was testimony the additional one percent might have gone to Greenwood in the form of precommitment fees (although it appears that 2% in precommitment fees would have been high and Chenaur testified he would not have paid it) and that Greenwood made the commitment to buy the mortgages at 100% par value at a time when the national market was 94%, and because of local conditions in Seattle the discount market was 92%.

7. To act with "intent to defraud" means to act knowingly, and with the specific intent to deceive; ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself.

The evidence in the case need not establish that the Greenwood Savings and Loan Association was actually defrauded, but only that its officers acted with intent to defraud.

Therefore, if the Government has shown beyond a reasonable doubt that officers of Greenwood Savings and Loan had the intent to deceive for the purpose of obtaining a financial advantage, it is not necessary for the Government to show that Greenwood Savings and Loan suffered a financial loss.

guilty of aiding and abetting where the principals were never prosecuted under the federal statute and were given immunity in return for testifying. We clearly stated in *Feldstein v. United States*, 429 F.2d 1092, 1095 (9th Cir.), *cert. denied*, 400 U.S. 920, 91 S.Ct. 174, 27 L.Ed.2d 159 (1970), that not only was it unnecessary for the principal to be convicted, but that he need not even be identified. *See also United States v. Martinez*, 479 F.2d 824, 829 (1st Cir. 1973). The record shows that there was little emphasis on the state convictions of Morgan and Connelly; the jury was clearly informed that they had never been prosecuted on the federal charge. The court's instructions on the first twenty-one counts as a whole related to the federal charge and there is little reason to believe the jury did not make up their own minds about the guilt of the principals on that charge without relying on the state convictions.

■ Regarding defendant's own intent, we believe that there was sufficient evidence that he wilfully assisted the principals in the criminal venture. As already noted, he testified at one point that unless he paid Territorial and Morco, Greenwood would not buy his loans. Before he had issued all of the 21 checks involved here, he learned the address he was sending them to was that of Connelly's home. He knew Morco and Territorial were not providing real brokerage services. Morgan and Connelly were the only two people Chenaur knew to be involved in the two companies, and he knew the two were directing benefiting. He testified before the grand jury that he thought Connelly and Morgan wanted to "get some extra money, that the savings and loan wasn't paying them enough money to live on. . . ." T. II at 180. This is sufficient to show Chenaur willingly and knowingly aided in the scheme.

## III. THE SUFFICIENCY OF THE INDICTMENT AND NEED FOR CONTINUING DISCOVERY AND BILL OF PARTICULARS

Defendant alleges that the indictment, which closely followed the language of 18 U.S.C. § 1006,[8] was insufficient to adequately inform him of the nature of the charges against him. He contends that without alleging more specific facts, the transactions may simply have been the result of mistake or poor administration. It was this alleged deficiency in the indictment which defendant also contends necessitated the trial court's granting a motion for continuing discovery and a Bill of Particulars. Defendant's counsel complained before the trial that:

I would really like to know what the indictment is saying is a prohibited act, and I don't know at this time . . ..

and that he wanted to know the manner and means employed in the receiving of the money and why it was a violation against the United States. He urges us to follow

---

8. Each of the 21 counts under 18 U.S.C. § 1006 were virtually identical except for dates and names. Therefore an example of one count will suffice. Count I reads as follows:

On or about May 17, 1971, in the Western District of Washington CARL CLAYTON CHENAUR did willfully aid and abet officers of the Greenwood Savings and Loan Association, the accounts of which were then insured by the Federal Savings and Loan Insurance Corporation, who, with intent to defraud the United States, the Federal Savings and Loan Insurance Corporation and Greenwood Savings and Loan Association, did share and receive indirectly monies and benefits, that is the sum of ONE HUNDRED FIFTY DOLLARS ($150.00), by means of and through a disbursement from Bonded Escrow, Inc. to Morco Enterprises, Inc. paid in conjunction with transactions between First Western Mortgage Corporation and Greenwood Savings and Loan Association.

Relevant portions of 18 U.S.C. § 1006 read as follows:

Whoever, being an officer . . . of . . . any savings and loan . . . association . . . the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, . . . with intent to defraud the United States or any agency thereof, or any corporation, institution, or association referred to in this section, participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association, shall be [punished].

*United States v. Quinn,* 365 F.2d 256 (7th Cir. 1966), which found an indictment containing the essential elements of § 1006 insufficient.

The sufficiency of the indictment must be judged in light of *Hamling v. United States,* 418 U.S. 87, 117–118, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1973):

> Our prior cases indicate that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hagner v. United States,* 285 U.S. 427 [52 S.Ct. 417, 76 L.Ed. 861] (1932); *United States v. Debrow,* 346 U.S. 374 [74 S.Ct. 113, 98 L.Ed. 92] (1953). It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Carll,* 105 U.S. 611, 612 [26 L.Ed. 1135] (1882). "Undoubtedly the language of the statute may be used in the general description of the offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *United States v. Hess,* 124 U.S. 483, 487 [85 S.Ct. 571, 573, 31 L.Ed. 516] (1888).

We believe the indictment here was sufficient. The indictment clearly charged both Chenaur (as an aider and abettor) and the principals with intent to defraud a savings and loan institution whose accounts were federally insured. It is hard to believe that where the amounts, dates and parties of each illegal transaction were specified, Chenaur needed additionally to be told the "manner and means employed" in the payments in order to defend himself. The initial indictment (later superseded) was returned on January 20, 1976; however,

Chenaur had previously been before the grand jury on October 23, 1975, and was specifically asked if certain payments to Territorial and Morco were not kickbacks. Prior to trial, defendant had filed discovery motions and a motion for a Bill of Particulars. However, after meeting with the United States Attorney defense counsel filed a Certificate of Compliance. Subsequently, his motions were struck and defense counsel then contended he had never really received everything he requested. At trial, the government's attorneys stated they had spent approximately four hours the week before going over the government's proof with defense counsel and working out a stipulation of the facts. The trial judge had the government attorneys explain how they intended to prove the charges; the explanation substantially answered defense counsel's questions regarding who was defrauded, who had intent, and what constituted the illegal transaction. At the end, defense counsel still stated "It would be nice if I knew what the government's position was." T. II, p. 26, 1. 18–19. It was the trial court's observation that defense counsel knew the government's position, but simply did not agree with it. We believe the trial court pinpointed the problem here. We have stated that:

> A distinction is to be drawn between an indictment which fails to set forth the essential facts necessary to apprise a defendant of the crime charged and one which, though it specifies the necessary facts, fails to specify the theory upon which those facts will be proved at trial or the evidence upon which the proof will rest. Rule 7(c), F.R.Crim.P., provides that an indictment must state the essential facts constituting the offense charged, but may allege that the means by which the defendant committed the offense are unknown or that he committed it by one or more specified means.

*United States v. Markee,* 425 F.2d 1043, 1047–48 (9th Cir.), *cert. denied,* 400 U.S. 847, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970). Defendant here not only had the necessary facts, but the government's theory of the case—he simply did not agree with the the-

ory. We conclude that, as the defendant in *United States v. Alsop*, 479 F.2d 65 (9th Cir. 1973), Chenaur was "well aware" of the charges against him.

■ The granting of the motion for a Bill of Particulars rests in the sound discretion of the trial court. *United States v. Clay*, 476 F.2d 1211 (9th Cir. 1973). Since we have already found that the indictment was sufficient, it clearly was not an abuse of discretion to deny the motion for continuing discovery and the Bill of Particulars.

## IV. THE SUPERSEDING INDICTMENT

During the course of the 1973 audit of Greenwood by the Federal Home Loan Bank Board, the examiner subpoenaed Chenaur on behalf of the Board and his deposition was taken under oath by the Board's attorney. Chenaur volunteered the statement that he had never paid any money to Marvel Morgan. This statement formed the basis for Count XXII in both the original and superseding indictment. The original indictment charged Chenaur with perjury under 18 U.S.C. § 1621. The superseding indictment charged Chenaur with concealing a material fact and making a fraudulent statement as to a material fact in a matter within the jurisdiction of the Federal Home Loan Bank Board in violation of 18 U.S.C. § 1001.

■ Defendant contends that filing this superseding indictment four days before trial prejudiced him. While we agree with his statement that "Due process prohibits trial by surprise," we fail to see how he was "surprised" when the identical statement served as the basis of both counts. The defendant was fined $5,000 on Count I and given a three-year suspended sentence on all other counts. Having found the evidence was sufficient to sustain the other 21 counts of the indictment, it would be unnecessary for us to even consider any error with respect to Count XXII under the concurrent sentence doctrine. *United States v. Miller*, 520 F.2d 1208, 1212 (9th Cir. 1975); *United States v. Westover*, 511 F.2d 1154, 1155 (9th Cir.), *cert. denied*, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975).

## V. THE REQUESTED VOIR DIRE QUESTIONS

■ The trial court refused to ask five of Chenaur's requested voir dire questions, and he alleges prejudice. Trial courts are given broad discretion in deciding the scope of the voir dire examination. *United States v. Gonzales-Benitez*, 537 F.2d 1051, 1053 (9th Cir. 1976); *United States v. Golden*, 532 F.2d 1244, 1247 (9th Cir. 1976); *United States v. Perez-Martinez*, 525 F.2d 365, 368 (9th Cir. 1975). We note that four of the five questions dealt with how the jurors felt about the giving of honorariums or gifts in the course of business. Chenaur never classified the payments to Morco and Territorial as gifts or honorariums at any time during the preliminary investigation or trial. While the remaining question, which was aimed at the jurors knowledge and reaction to other current scandals, may have been more relevant, we do not find it was a clear abuse of the trial judge's discretion not to ask about it.

For all of the foregoing reasons, the judgment of the district court is hereby AFFIRMED.